# DECISIONS

OF THE

# SUPREME COURT OF FLORIDA.

## JANUARY TERM, A. D. 1889.

CHARLES L. BUCKI, SURVIVING PARTNER, APPELLANT, VS. CHARLES F. CONE, APPELLEE.

1. Action on the case, and not trespass *vi et armis*, is the proper remedy for damage to the reversioner, both in relation to real and personal property, and under our statute the venue may be either in the county where the cause of action accrued, or in the county of the residence of the defendant.

2. A declaration is not faulty in omitting to set forth facts that are more properly matters of evidence, when its general allegations include the facts and are not mere conclusions of law.

3. A partnership may be sued for a tort, and if one of the partners dies pending the suit, an order to carry it on against the survivor is proper, and a judgment against the survivor will not be error, there being no question of debt, or of the rights of creditors of the partnership involved.

4. Rivers in which the tide ebbs and flows are navigable streams at common law, and in this country all rivers are regarded as navigable as far up as they may be conveniently used at all seasons of the year for the purposes of commerce, and also when declared by statute to be navigable; but further than this, what constitutes a navigable stream, so far as to make it a public

1

highway, is a question of fact to be determined by the natural conditions in each case. A stream of sufficient capacity and volume of water to float to market the products of the country, of whatever kind or however floated, will answer the latter conditions of navigability; and it is not essential that the stream should be continuously in a state suited to the floatage.

5. The Suwannee river at and above White Springs, in Hamilton county, held on the evidence to be a navigable stream and public highway for the floatage of logs.

6. But as the statute authorizes the building of a bridge across such a stream, if built so as not to obstruct or unreasonably impede navigation, the floatage of logs must be with due and reasonable regard to the rights of the bridge owner. If he provides sufficient space and proper conveniences for the passage of logs, singly or in rafts, the floatage must be conducted in such manner as to numbers or condition of logs as will suit the passage way. Failing in this, if injury results to the bridge, the owner will be entitled to compensation therefor.

7. The bridge in this case being shown to have a space of over fifty feet for the passage of logs and to have guide booms to direct the floatage, is held not to conflict with proper navigation of the river there; and the letting loose 3,500 or 4,000 logs on rising waters to be precipitated against the bridge is negligence, which, if resulting in the destruction of the bridge, entitles the owner to damages from the negligent party.

8. In addition to the definition of negligence, constituting a cause of civil action, given by this court, another apt one for this case is that it is such an omission, by a responsible person, to use that degree of care, diligence and skill, which it was his legal duty to use for the protection of another person from injury, as in a natural and continuous sequence causes unintended injury to the latter.

Appeal from the Circuit Court for Madison county.

Action on the case.

The facts in the case are stated in the opinion.

*A. W. Cockrell & Son* for Appellant.

Charles F. Cone brought this action in the Circuit Court of Madison county against Louis Bucki, then in life, and Charles L. Bucki, describing them in the summons and declaration as partners, doing business under the name of L. Bucki & Son, but there was no allegation in plaintiff's pleading they were such partners; and claimed twelve hundred dollars damages resulting to him from the loss of a bridge, theretofore spanning the Suwannee river at White-Sulphur Springs, between Hamilton county and Columbia county, Florida, and service was made on both defendants; the gravamen of the amended declaration is that the servants of the defendants precipitated logs in mass from a boom into the stream, when it was much swollen, and the sweep or pressure of the logs carried away the bridge. It is not alleged, however, that the said servants were in the employ of defendants as partners; nor that the boom, from which the logs were cut, was used by the defendants; in their firm business, nor indeed does it appear from the pleadings in what business the firm was engaged. The cause was submitted to the court for trial without a jury. Louis Bucki died pending the suit, as is shown in the transcript, (see Record, page 31,) which is as follows:

"December 24, 1886, came the plaintiff, by his attorney, and moves to amend the pleadings so to present the fact that *puis darrien continuance* one of the defendants, to-wit: Louis Bucki had died, and that the surviving partner of said firm of L. Bucki & Son be made the defendant. Granted."

This motion thus marked "Granted" was not followed up, either by a change in the pleadings, or otherwise; and the judgment rendered was:

"That all the issues of fact herein be and the same are hereby found for the said Charles F. Cone, the plaintiff, and

against the said Charles Bucki, as the surviving partner of said late firm of C. L. Bucki & Son, the defendants, and it is further considered and adjudged upon said testimony so taken in writing and filed herein that the said plaintiff do have and recover of and from the said defendant as the surviving partner as aforesaid the sum of six hundred dollars ($600.00) as his damages herein, together with his costs in this behalf expended. That the Clerk tax the costs as aforesaid and enter judgment for said damages and costs according to law."

And thereupon, upon the aforesaid order of court, judgment was entered. And from this judgment Charles L. Bucki, in the capacity in which judgment against him was rendered, that is as surviving partner, appeals.

### ARGUMENT.

What is the nature of the action, interpreted in the light of the præcipe, process and declaration ?

1. Is it a local or a transitory action ?

2. Is it an action of trespass or case ?

3. Is the injury for which damages are claimed an injury to real or an injury to personal property ?

4. Are acts of the servants for which the defendants are sought to be held liable charged to be intentional or merely negligent ?

5. Is the action against Louis Bucki and Charles L. Bucki, in their capacity as a firm, or in their several capacity as individuals ?

Process and pleadings which leave in doubt or undetermined the five several inquiries herein propounded, or either of them, cannot be sustained under a system whose highest claim to distinction is in the simplicity of its form of procedure, the exactness and precision of the issues developed by its pleadings, and the " certainty " of the judgments to be pronounced thereon.

These several propositions, though not in the order named, will form the basis of the present discussion.

An error assigned here, which was a ground urged below for setting aside the judgment, is, " said judgment is not warranted by the pleadings." Can an action, in form *ex delicto*, and in fact having no *ex contractu* features, instituted against two defendants described as partners, and proceeding upon the plea of " not guilty," result in a judgment against one of the defendants, not as an individual, but as a surviving partner, the other defendant having died? The form of this judgment, it will · be observed, protects a tort feasor, proceeded against as such, from the consequences of his wrong doing, and puts a lien against the assets of a firm of which he is surviving member ; in a word, his tort is made a firm debt, in the sense which makes a surviving partner a trustee for the due application of the firm assets to the firm debts ; and a right is thus created by the solemn judgment of the court, in favor of the appellee, to collect this judgment out of the assets of the firm, in preference to the rights of the separate creditors of Chas. L. Bucki. Bowden vs. Schalzell, 1 Bailey's Eq., (S. C.) 360.

If appellee, by his pleadings, could only establish a claim against Charles L. Bucki individually, and Louis Bucki individually, as joint wrong doers, growing out of their several capacities and liabilities as tort feasors, it is clear he could not claim (Louis Bucki having died) what has been awarded him, both upon the findings and the judgment, a participation in the firm.assets, until all the partnership creditors are paid ; and then only upon the individual partner's interest in the surplus. And *e converso*, it is equally clear the partnership creditor is not permitted to establish his claim against the estate of an individual partner, until his

separate creditors have been paid out of that estate. Wilder vs. Keelet, 3 Paige Chan. 167.

Indeed, the rule is, the representatives of a deceased partner cannot be sued at law for the partnership debts; the suit must be brought against the survivors, into whose hands the partnership effects must pass by survivorship, for the payment of the partnership debts. Wilder vs. Keelet, above.

It is only in the purview of this rule that a suit at law can be commenced, maintained or concluded, against a surviving partner, as such; and it is only in the sense that he is a trustee, as surviving partner, of the partnership assets of the firm, for the payment of partnership debts, that a judgment can be recovered against him at law, as surviving partner.

So the question recurs, was the liability sought to be asserted in this action based upon a partnership debt? It will be observed that the declaration does not aver the defendants are partners, or were such at the time of the injury; it only refers to them as partners; nor does it aver that the servants by whose acts the injury resulted were in the service of the defendants as partners; hence they were not sued as partners in the sense which, under Rule 24, common law actions, put in issue the existence of the partnership in its relations to the alleged injury, or, in the sense the failure to deny which by the defendants impliedly admitted it, in respect of this action. It was supposed, had a demurrer been put in upon the specific ground that the defendants could not be held liable as partners, in this form of action, the plaintiff could have successfully insisted the action was not against the partnership, but against the several individuals composing it.

We submit an " *ex delicto* " liability, a liability which

cannot be enforced in any other form of action than " *ex de-licto*," is in no legal sense a debt, whether incurred by an individual or by a partnership as such, if such an *ex delicto* liability can legally be incurred by a partnership. Jacksonville Street Railway Co. vs. Chapell, Ex., at June term.

It is true the tort feasor may be compelled upon appropriate pleadings, to pay the damages judicially ascertained to have resulted from the tort, to the party injured. The judgment, in this case creates the relation of debtor and creditor between the tort feasor and the party injured. No such relation existed before the judgment. 3 Bla. Com. 154.

Hence the finding of fact that all the issues, both those raised upon the pleadings to the original and amended declarations, against Chas. L. Bucki, as surviving partner, was unsupported by the pleadings as well as by the testimony.

Again, a ground of demurrer, interposed below and overruled by the Court, was that it did not sufficiently appear from the declaration whether the injury declared on was committed on real or personal property. Take it in either aspect. Suppose it was in the mind of the pleader to declare upon and recover for an injury to real property.

" Trespass to land must be brought in the county where the land lies, and it must appear on the record the trespass was committed in that county."

Champion vs. Doughty, 3 Harrison (N. J.) 3.

" No rule is better settled than that an action for an injury to real property cannot be brought out of the country, State, district or county, in which the land is situated."

Thayer vs. Brooks, 17 Ohio, 489; S. C., 49 ; Amer. Dec., 474 and note.

The declaration avers that the bridge spanned the Su-

wannee river at White Sulpher Springs, one end resting on the Columbia county side, and the other on the Hamilton county side. The jurisdiction then of the subject matter of this controversy, regarded as an injury to real estate, was in the Circuit Court of Columbia county, and in the Circuit Court of Hamilton county; there was no jurisdiction of the subject matter, considered as an action of trespass to realty, in the Circuit Court of Madison county, where suit was brought. A want of jurisdiction of the subject matter is pecisely the element which consent cannot supply. It is the authority of the Court, and can be derived alone from the law, and the want of it is available in the Appellate Court. 2 Bac. Ab. 618; State of Rhode Island vs. State of Mass. 12 Pct. 720; Ives vs. Finch, 22 Conn. 101; Boon et al vs. Poindexter, 12 S. & M. 649; Bostwick vs. Perkins, Hopkins & White, 4 Ga. 50; Martin vs. Higgins, 23 Ala. 176; Moore vs. Fiquet, 19 Ala. 318; Merrill vs. Jones, 8 Porter, 554; Wyatt vs. Judge, 7 Porter, 37.

The action of the Court then in overruling the demurrer can be vindicated, if at all, only upon the theory that the declaration set up an injury to personal property.

Regarded as a declaration for an injury to personal property, it is wholly insufficient.

" The nature of the possession necessary to sustain the action is very clearly explained by Fowler, J., delivering the opinion of the Court in Wilson vs. Martin, 40 N. H., 83, where he says: ' The gist of trespass to personal property is the injury done to the plaintiff's possession. The substance of the declaration is that the defendant has forcibly and wrongfully injured property in the possession of the plaintiff. To maintain the action it is absolutely essential that the plaintiff should have had, at the time of the alleged injury, either actual or constructive possession

of the property injured. His possession is constructive when the property is either in the actual custody and occupation of no one, but rightfully belongs to himself, or when it is in the care and custody of his servant, agent, or overseer, or in the hands of a bailee for custody, carriage or other care or service, as a depositary, mandatory, carrier, borrower, or the like, where the bailee or actual possessor has no vested interest or right to the beneficial use or enjoyment of the property, or to retain it in his possession, but the owner may take it into his own hands, at pleasure. But where the general owner has parted with the actual possession in favor of one who enjoys the exclusive right of present possession and enjoyment, retaining to himself only a reversionary interest, the possession is that of the lessee or bailee, who alone can maintain an action of trespass for a forcible injury to the property. 1 Chit. Pl. (7 Ed.) 188, 195 ; 2 Green. Ev. secs. 613, 614, 616, and authorities cited ; Clark vs. Carleton, 1 N. H., 110 ; Poole vs. Symonds, *Id.* 289 (8 Am. Dec. 71); Heath vs West, 28 *Id.* 101 ; Moulton vs. Robinson, 27 *Id.* 550 ; Marshall vs. Davis, 1 Wend. 109 ; Nash vs. Mosher, 19 *Id.* 431 ; Newhall vs. Dunlap, 14 Me. 180 ; Gay vs. Smith, 38 N. H., 171.' "

In this case the amended declaration shows suit is brought not for an injury to the possession, but to the reversion.

And so it is, the pleadings equally fail to support the judgment, whether regarded as an action for an injury to real property, or an action for injury to personal property.

The wrong complained of, whatever its nature, is an alleged injury to appellee's bridge. We insist as matter of law :

1. The mere fact that an injury has been caused is not sufficient to hold defendants liable. " No one is responsible for

injuries resulting from unavoidable accidents, while engaged in lawful business. A party charging negligence as a ground of action, must prove it. He must show the defendant by his action or omission has violated some duty incumbent upon him, which has caused the injury complained of." 15 Wall. 537.

2. The right of floatage, in every stream, which is capable in its natural state and ordinary volume of water, of transporting, in a condition fit for market, the products of the forests, or mines, or of the tillage of the soil upon its banks, is a public right, "and ought to be liberally supported." Morgan et al., vs. King, 35 N. Y. 454 ; Thunder Bay Booming Co. vs. Speechly 31 Mich. 336 ; S. C., 18 Amer. Rep. 190 and cases there cited ; Sullivan vs. Jernigan, 21 Fla. 279; Lewis vs. Coffee Co. 77 Ala., 190 and cases cited in appeltant's brief.

3. Such capacity need not be continuous; if it is ordinarily subject to periodical fluctuations, attributal to natural causes, and continuing sufficiently long to make the right available, the right will be upheld ; nor is it necessary that the stream should be capable of being navigated against it current, as well as in the direction of its current. *Ibid.*

4. It is not essential to the exercise of the right of floatage, that the property to be transported should be carried in vessels, or in some other mode, where it can be guided by the agency of man, provided it can ordinarily be carried safely without such guidance. *Id.*

5. The public right of floatage, and the private rights of riparian proprietors, must be exercised, each with due consideration for the other ; and any injury which the latter receives, in consequence of a proper use of the stream for floatage, he must submit to, as incident to his situation upon navigable waters. *Ibid.*

Or, as the proposition is asserted elsewhere, the restriction upon the right of navigation is "there must be no carelessness or malice, no unnecessary damage, but a *bona fide* exercise of the right of navigation." 1 Jones Law, (N. C.) 299 ; S. C. 62, Am. Dec. 170.

Interpreted in the light of these principles, no case is stated or proven upon which to hold the defendants liable. The right of the defendant to a floatage of their logs upon the stream is not questioned in the declaration. It is alleged in the original declaration that there was a "considerable rise or swell in the river;" and that "the logs ran down said river with such force and velocity, and in such mass, as to destroy plaintiff's bridge." No fact or act or conduct of the defendants or their servant, showing an inconsiderate use of said stream in pursuance of their right of floatage is averred ; nor is it shown that the injury therein complained of, was not incident to the situation of said bridge upon a navigable stream, subject to the right of floatage, and exposed to the dangers recurring from a considerable rise or swell of the current ordinarily under the guidance of man's agency, but at that particular time, swollen beyond his control, and precipitating floating logs upon the bridge with such velocity as to carry it away and destroy it. The statement of negligence, as a mere legal conclusion, without avering the facts of omission or commission, which in law constitute it, is not traversible, and cannot be regarded in the determination of the nature of the pleading.

A party charging negligence as a ground of action must prove it. He must show the defendant, by his action or omission to act, has violated some duty incumbent upon him which has caused the injury complained of. 15 Wall. 537. It is not claimed either in the declaration, nor does it appear from the evidence, that the erection of the boom

was an unlawful act. Nor is it claimed in the original declaration that the " defendants, by their agents, employees, or servants, carelessly, negligently and improperly turned or cut loose said logs from said boom." But the precise and only act, the doing of which is characterized as carelessly, negligently and improperly done, and made the gravamen of the declaration, is that the defendants, by their agents, after so cutting and turning loose said logs, " so carelessly, negligently and improperly drove and managed said logs," that " by and through the negligence and improper management of said logs by said defendants, through or by their said agents, employees or servants, that said logs ran down said river with such force, velocity and in such mass as to wrongfully and unlawfully strike plaintiff's bridge," etc.

Now the case as sought to be made by the proof, is that the damage occurred through Waldron's wrongful act in that he turned or cut loose the logs from the boom, not in detail, but in mass, not that he, subsequently, improperly drove or managed said logs; and that the pressure which destroyed the bridge was the result of the continuous rise in the river for three days.

Again, the only witness through whom the plaintiff seeks to make out the alleged lawless act of wrong doing in cutting the logs loose in mass from the boom, for which the appellants are to be mulcted in damages, is Waldron, who, from the witness stand proclaims that he was the guilty agent by whom the lawless act was committed. Instead of turning the logs loose gradually, " time was of moment to him," and he cut the logs loose at once and in mass. It is apparent this act, whether lawful or unlawful, was intended by him, was an intentional act, was done purposely, as he expressed it, to save the time which would have been consumed in turning the logs loose in detail.

Conceding for the sake of argument, that the act of cutting those logs loose in mass instead of cutting them loose in detail from that boom was an unlawful act, it is clear the appellants were not present when the act was committed; it is not pretended that they expressly authorized the logs to be so cut loose; but it is clear that the act of so cutting them loose was an intentional act on the agent's part; hence the principal cannot be held responsible. Cox, Brainard & Co. vs. Kuahey, 36 Ala., 340; Blackburn vs. Baker, 1 Ala., 173.

The rule is thus stated. The master is not liable for the tortious acts of the agent, if intentionally done, although within the range of his duties, unless the tortious act was commanded, or adopted by the master.

McManus vs. Cricket, 1 East 106, is the leading authority, followed by: Porter vs. Essex Bank, 17 Mass., 479; Southwich vs. Nicholas, 5 Mump., 483; Wright vs. Wilcox, 19 Wend., 343; Vanderbilt vs. Rich. Turnpike Co., 2 Com., 479; Purryhear vs. Thompson, 5 Hump., 379; Ill,. Cent. R. Co. vs. Downey, 18 Ills., 259; Wesson vs. Seaboard & R. R. Co., 4 Jones' Law, 379; Church vs. Mansfield, 20 Conn., 284; DeCamp vs. Miss. & Mo. R. R. Co., 12 Iowa, 348.

In 39 New York the point is thus stated:

"It cannot be presumed that a master, by intrusting his servant with his property, and conferring power upon him to transact his business, thereby authorizes him to do any act for its protection that he could not lawfully do himself."

No just interpretation of the testimony can rescue Waldron, the agent, from the intentional doing of the act, relied on by the plaintiff as tortious, and resulting in the destruction of his bridge: no just interpretation of Brush's

uncontradicted testimony can relieve Waldron, in doing this tortious act, of having departed from the express and explicit instructions of his employer, in reference to letting the logs loose gradually. Indeed, the agent of the master, who had control of the logging, swears that the boom was built by him, to prevent logs rushing down stream in mass, resulting from their accumulation on the shoals, and being precipitated therefrom by the swelling of the stream, and that the boom was so constructed that the logs might be let loose therefrom in detail. That the appellee so understood it is also obvious from the fact that he swears he met Waldron, on his way to turn the logs out from the boom, and cautioned him to turn them out gradually. But Waldron, instead of so turning them loose, cut the boom and thus precipitated the mass into the stream ; and swears he did so, because the time was "important to him."

But suppose the master may be held liable for the servant's intentional cutting of the boom, and thus precipitating the logs in mass upon the stream. Can he also be held liable for the destruction of the bridge, which survived the precipitation of the logs upon it for four days, and only yielded at last to the constantly increasing pressure and velocity of the steadily swelling waters. In the language of appellee's witness (page 29 of Record): "The bulk came that afternoon. They kept coming and breaking loose all the while. Saw the first logs that came. We passed scattering logs through, but then logs came in a mass and the river continued to rise. I think it continued to rise from before 26 to June 30, when bridge was washed away."

*B. H. Palmer*, for Appellee.

MAXWELL, J.: This action was brought in Madison county, and in the original and amended declarations is styled an action on the case. It was against Louis Bucki and Charles Bucki, partners, doing business under the name, firm and style of L. Bucki & Son, and the declaration ran against them accordingly. The amended declaration avers that " on the 30th day of June, 1884, the plaintiff (Cone) was lawfully enfranchised and the legal owner of a certain toll bridge spanning the Suwannee river at the White Sulphur Springs, Florida, the northern abutments of said bridge resting upon the bank of said river, in Hamilton county, * and the southern abutments * resting upon the southern bank, * in Columbia (county), * which said bridge on the aforesaid day was in the possession and occupation of O. K. Paxton as tenant thereof to the said plaintiff the reversion thereof then and still belonging to the plaintiff; and that the defendants are the owners of a certain boom north and above the said toll bridge, * said boom made and constructed for the purpose of holding and detaining logs, timber &c. in said river; that in said boom * defendant had collected and amassed a large lot or number of logs; that upon a considerable swell or rise of the water in said river on or about the 26th day of June, 1884, the defendants by their agents, employees or servants wrongfully, carelessly and negligently cut loose said boom and turned out in mass said logs from said boom, and so improperly, carelessly and negligently drove or managed said logs that by and through said wrongfully, carelessly and negligently cutting said boom and turning said logs out of said boom in mass, and the improper, careless and negligent driving and managing said logs by said agents, employees or servants * the said logs ran down said river with such velocity and in such mass as to wrongfully and unlawfully on the said 30th day of June,

1884, strike plaintiff's bridge and carry away and utterly destroy the said * bridge * to the damage of plaintiff," &c.

There had been a demurrer to the original declaration, and the amended one was also demurred to. The court overruled both. This action of the court is assigned for error as to each, but we confine our attention to the latter, as the former was practically out of the case when the latter was filed. It is said for demurrer in the first place, that while the " declaration is entitled an action on the case, yet the injury complained of, if the allegations therein made constitute an injury, is a case of trespass *vi et armis.*" If this be a good ground of demurrer in any trespass case, it is not in a case like this. The plaintiff sues as owner of the bridge, not being in possession thereof at the time of its destruction, but the possession being in the tenant to whom he had let it. That tenant would be the proper person to sue for any injury to the possession, but for injury to the reversion an action on the case by the plaintiff is the proper remedy. This is the rule as to both personal and real property. Chitty on Pl., (16 Am. Ed.) 71-2. And as to venue the question arising from the fact that the bridge stretches from one county to another, while the action was brought in a third, where defendants resided, we incline to the opinion that under our statute such an action, not involving the property itself, but only damages for injuries to it, may be brought either in "the county in which the defendant resides, or (in which) the cause of action accrued." McClellan's Dig., 811, section 5. For construction of the statute see Russ vs. Mitchell, 11 Fla., 80. But if there is doubt on this, the objection to the venue should have been made by plea in abatement, which was not done, and it was not available either on demurrer or after trial on pleas to the merits.

The demurrer further holds the declaration faulty in averring that plaintiff is "lawfully enfranchised and the legal owner" of the bridge, without setting forth the facts on which the averment is based, and also in failing to set forth the source and extent of the right to keep or maintain the bridge, so as to enable the court to determine whether the franchise has been so guarded and restricted as to protect the right of navigation.

We think the declaration sufficient in the averments made, not being mere conclusions of law, and that the facts mentioned as not being set forth are matters of evidence to be brought out on the trial. And the same is our view as to other facts not averred, which need not be recited here, and the absence of which constitute other grounds of demurrer. It is our opinion the demurrer was properly overruled.

During the pendency of the case there was a suggestion of the death of Louis Bucki and an order to amend so as to make the surviving partner, Charles L. Bucki, the defendant, and the judgment was against the latter as surviving partner. This is assigned for error. The objection seems to us to be untenable. In so far as it may rest upon an idea that a partnership cannot be sued for a tort, that is a mistake. The law is otherwise. 1 Lindley on Partnership, 283 ; Linton vs. Hurley, 14 Gray, (Mass.) 191. Then the action could be maintained against the partners as a firm, and if both had lived a judgment could have gone against the firm. When one of them died that did not abate the action, and it was altogether proper to carry it on under suitable order against the survivor. It is no answer to this to say that it was not a debt, and that to make it a debt by judgment would be in derogations of the rights of creditors of the firm. In the first place, even if

ordinary creditors were allowed a preference, that is not a reason why the judgment should not be given, for there might not be occasion for any question as to preference; and in the next place if there should be occasion it is not to be anticipated as a valid objection to a rightful judgment. It will be time enough to determine how the judgment will affect outside parties when they are in a position to interfere. The surviving partner has only to defend against liability of the firm, and if unsuccessful in that the judgment should condemn him as such surviving partner to pay the damages found. We think that in this respect the judgment was correct.

The parties having waived a jury, the case was tried on the facts by the court. The findings of the court on " all the issues of fact," and the refusal of the court to grant the motion of defendants to set aside the findings and judgment thereon, are assigned for error. The grounds are that the findings are contrary to the evidence and the law, and that the judgment is not warranted by the pleadings. As to the last, we have already expressed our opinion in favor of the judgment. The others bring up the important and main questions we have to determine, namely, whether the Suwannee river at the point where it was spanned by the bridge was a navigable river, and if it was, what were the relative rights of those entitled to its use and the owner of the bridge ; and (if these questions should be so determined as to leave the enquiry necessary) whether appellant's firm were guilty of negligence from which arose liability in damages?

Where the tide ebbs and flows in a river the common law regarded it as a navigable stream, in which the public had a right of way, and in this country all rivers, without regard to the ebb and flow of the tide, are generally

regarded as navigable as far up as they may be conveniently used at all seasons of the year with vessels, boats, barges, or other water craft, for purposes of commerce ; and others are regarded as navigable when so declared by statute.   Further than this, what constitutes a navigable river free to the public is a question of fact to be determined by the natural conditions in each case.   A stream of sufficient capacity and volume of water to float to market the products of the country will answer the conditions of navigability, and is a public highway open to all persons for the business of floatage to which it is adapted, whatever the character of the product, or the kind of floatage suited to their conditions.   Though it may not be adapted to the use of vessels, and only fit for floating logs or rafts, yet if required for such use, and there is sufficient business, present or prospective, to render the easement a matter of public concern, it will be regarded as a public stream for that purpose ; and it is not essential to the easement that the stream should be continuously, at all seasons of the year, in a state suited to such floatage.   If of capacity a sufficient portion of the year to make it useful as a public highway, it would be subject to the easement.   Authority for these views will be found in Cooley's Con. Lim., 728 ; Browne vs. Chadbourne, 31 Maine 9 ; Morgan v. King, 35 N. Y., 454 ; Walker vs. Allen, 72 Ala. 456 ; Lewis vs. Coffee County, 77 Ala., 190.

We think the evidence in this case imparts the character of navigability to the Suwannee river in the sense of a public highway above and to the point at which the bridge of appellee was erected.   The testimony is, that the stream had been used a long time for floating logs, that for eight or nine months of the year its ordinary stage of water admits of such floatage, and that it has been used for the purpose both in driving logs thrown in singly and for

floating them in rafts.   On the other hand, it has not been used to float any other products of the country, and  there are shoals above and  below the  bridge that  prevent any floatage of  logs  at  low water ;  but  the fact  that  logs *can* be floated, and the length of time  the river is available for that, sufficiently overcome these objections to its character as a navigable stream.   The abundant  pine  forests in the country it traverses, as  appears in  evidence, and the value of the logs they yield for  milling  purposes, present an im- portant article of commerce, as  much  entitling  the public to this natural highway for  floating  them  as if  various other products were being carried on it.   And  this fact of commercial importance to the public  furnishes the ground upon which  the  private  rights of  owners of  the bed of a river are made subject  to the  right of  way in  the public, · where the river is not navigable technically or *prima facie*, that is, where the  condition as to  tide, or  the continuous adaptability for general  navigation, leaves  no question  on the subject.   In all other cases  the stream  must be shown to be capable of valuable floatage, and  it should also appear that there are products or  things of  value along its course giving the public an  interest in its facilities.   Another mark of navigability which  the evidence shows as existing in this case is, that in the United States survey of the adja- cent lands, instead of  including  its  bed  the  river was meandered.   Altogether we  think  appellant's firm should be sustained in  the claim of  right  to  float logs down the river.

This brings us to the question of appellee's  rights in re- spect to the bridge.   Did he have a right to build it at all, and if he did, what are the  limitations on  that right ? The statute authorizes the County  Commissioners of each county to grant licenses for keeping toll bridges, and where

the waters divide two counties a license from either will suffice, but the rate of toll must be fixed by both.  Mc-Clellan's Dig., 536-7.

The bridge of appellee was authorized by double license, one from the county of Hamilton, and the other from the county of Columbia, and both counties fixed rates of toll. There is nothing in the statute to indicate the class of streams over which bridges may be kept, and it is to be presumed that it authorized them wherever public convenience and public travel and trade made a demand for their use, as well over navigable streams of the character of this one as over others.   The bridge of appellee, therefore, had its existence from legal authority.   But it is to be understood that this authority conferred no right to so construct it as to obstruct or materially interfere with the navigable uses of the river.   Cooley's Con., Lim., 231-2. There are two rights to be observed, that of the public in the highway, and that of the bridge owner to his structure across the highway ; and it is obvious that each must exercise the right possessed with due and reasonable regard to the right of the other.   As expressed in Veajie vs. Dwinel, 50 Me., 479, the privileges of the bridge owner " must be so exercised as not to interfere with the substantial rights of the public in the stream as a highway for the purpose of transporting such property as, in its natural capacity, it is capable of floating.   The use of both parties must be a reasonable use, and the rights of both must be exercised in a reasonable manner."   So the question comes : Is appellee's bridge constructed in a way to give reasonable facility for floating logs between its piers or supports ?   There must be a convenient and sufficient passage-way left for the purpose, having regard to the character of the floatage, and on the other hand a driving or

rafting of logs in such numbers or quantity as will in floating or by proper management adapt themselves to the passage-way. Sufficient space and guide conveniences for a reasonable body of floatage, makes the rule that defines the rights of the parties. And these are matters of fact to be determined in each case by the evidence. In this case it was in testimony that the centre span of the bridge was between fifty and fifty-five feet, that there were guide booms to direct the logs to this opening, and that it was as wide as customary ; that twenty-five logs floating abreast could pass through it, and that its capacity was sufficient for an ordinary raft of logs. On this evidence we cannot say against the finding of the court below, that the bridge fell short of the allowable requirements of navigation at that point, or, in other words, that it improperly impeded or obstructed that navigation.

The right of the bridge owner being sustained thus far, has he made a case against appellant's firm for damages on account of the destruction of his bridge ? The evidence is that the firm had in a boom fifteen miles above the bridge between 3,500 and 4,000 logs, and that on a rise of the waters of the river an employee of the firm opened the boom and let loose the logs in a mass, and that they floated down the river to the bridge in a mass, and after pressing against it three or four days carried away all except the abutments. They struck and broke one of the guide logs, having come down the river jammed together as close as they could be, and pressing in mass till they got to the bridge. Several persons were engaged in trying to relieve the bridge, but only a few logs were got through, and a witness familiar with the business says that in the condition of the logs they "could not have been put through by any force." This is the material portion of the evidence

as to the manner in which the logs were floated, and it shows entire absence of reasonable care for the safety of the bridge and a total disregard of the obligation to respect the rights of its owner.

In Jack. St. Ry. Co. vs. Chappell, 21 Fla., 175, it is pronounced that "negligence is the failure to observe for the protection of another's interests such care, precaution and vigilance as the circumstances justly demand, and the want of which causes him injury." The facts of this case fit this definition most pertinently. In Railroad Co. vs. Jones, 95 U. S., 439, negligence is defined to be "the failure to do what a reasonable and prudent person would ordinarily have done under the circumstances of the situation, or doing what such a person under the existing circumstances would not have done. The essence of the fault may lie in the omission or commission. The duty is dictated and measured by the exigencies of the occasion," citing Wharton on Neg., sec. 1. Tested by this the essence of the fault in this case was in the commission of an act, namely, opening the boom to let the logs out in mass, which put the bridge in jeopardy. A fuller definition of negligence, and one very suitable to this case, is this: "Negligence, constituting a cause of civil action, is such an omission by a responsible person, to use that degree of care, diligence and skill which it was his legal duty to use for the protection of another person from injury, as in a natural and continuous sequence causes unintended damage to the latter." 1 Sher. & Redfield on Law of Neg., sec. 3. Surely it cannot be said that to precipitate 3,500 or 4,000 logs down the rising river to run their course, as the evidence shows, without guidance or attempted control, was the use of that degree of care, diligence and skill which it was the legal duty to use under the circumstances, and it was as if done upon

the assumption that whatever might be in the way had no right there. It was certainly not using the navigable waters with due precaution against periling property as much under protection of the law as was the right of floatage. We do not see how there can be any question as to whether it was negligence thus to expose the bridge to almost certain destruction, negligence in cutting the boom and setting afloat the large mass of logs without means to manage them, and negligence resulting in damage for which the owner of the bridge is entitled to full compensation.

But it is contended that this is not a case of negligence, but one of intentional wrong—that the employee of applicant's firm cut the boom purposely, and that for a tort thus committed, the firm is not responsible. Without stopping to consider the doctrine on which this contention rests, it is in our opinion not applicable here. The business of the employee was to get logs down the river to the mill of the firm. That was his object in cutting the boom. There is not shown any intention to injure or destroy the bridge, but only a purpose to accomplish his work as speedily as the condition of the river permitted. He took the risk of injuring the bridge by doing an act, not against the bridge itself, but in the course of his business, which in its natural sequence was calculated to result in the injury. That was not an intentional tort, but one which in its consequences became a tort, on the ground that under the circumstances the act was without due care and caution, and therein an act of negligence.

It is suggested that if there was negligence in the employee in letting the logs loose in mass, it does not follow that this caused the destruction of the bridge, since three or four days elapsed after the logs struck the bridge before it was carried away, and it " only yielded at last to the con-

stantly increasing pressure and velocity of the steadily swelling waters." To our minds this but emphasizes the fact of negligence. The logs should not have been turned loose as they were, in such a condition of the river, and the breaking of the bridge was as much a natural sequence of the accumulating pressure during these days as if caused by the first direct impetus of the mass of logs. Besides, the resistance of the bridge for such a length of time removes any idea that it was faultily constructed as regards its strength.

We see nothing in this to set aside the charge of negligence.

And the negligence was that of an employee or servant of the appellant's firm, for which the firm was responsible. See 1 Sher. & Red. on Neg., sec. 141, where it is said that " it is an old and thoroughly established doctrine that where the relation of master and servant exists, the master is responsible to third persons for the damage caused by the wrongful acts or omissions of his servants in the course of their employment as such." It was in evidence that the servant was employed by another employee of the firm who had supervision of the logging business, but that makes no difference as to the liability of the firm. In the book quoted above, sec. 157, the law is thus stated : " The master is, of course, liable, for the negligence of one whom his servant employs, by his authority, to aid such servant in the master's business. Such authority need not be express, but may be implied from the nature of the business, or the course of trade. Thus such authority would almost necessarily be implied in favor of a servant entrusted * * * with any task which could not be performed within a reasonable time by one man ;" and necessarily also in behalf of a servant employed in a busines requiring the assistance of others.

Other immaterial questions in the case cannot affect our conclusion that a new trial was properly denied, and that the judgment should be affirmed, which is done.